UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
M.E.S., Inc., et al.,                                    :
                                                         :
                           Plaintiffs,                   :
                                                         :               **MEMORANDUM AND ORDER**
              -against-                                  :               10-CV-02798 (PKC) (VMS)
                                                         :
LIBERTY MUTUAL SURETY GROUP, et al.,                     :
                                                         :
                           Defendants.                   :
                                                         :
--------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

On August 24, 2009, Plaintiffs M.E.S., Inc. ("MES"), M.C.E.S., Inc. ("MCES"), and

George Makhoul filed this lawsuit in United States District Court for the District of New Jersey

against Defendants Safeco Insurance Company of America ("Safeco"), Hirani-MES Joint Jenture

("HMES"), S.A. Comunale Co., Inc. ("Comunale"), and Liberty Mutual Insurance Company

("Liberty"). <u>Docket No. 1</u>; <u>Docket Entry 12/8/2009</u>. The lawsuit has since been transferred to

the Eastern District of New York. <u>Docket Entry 6/18/2010</u>. Plaintiffs alleged in the original

complaint that Defendants breached various indemnity agreements and are responsible for

damages arising out of Plaintiffs' loss of certain lucrative government contracts. <u>Docket No. 1</u>.

Plaintiffs also alleged that Safeco violated the Miller Act and tortiously interfered with Plaintiffs'

contractual relationships. <u>Id.</u>

Plaintiffs now move to amend their complaint to drop Defendant Hirani, to elaborate the

complaint's factual allegations, and to add three new claims. <u>Docket No. 109</u>. Defendant Safeco

opposes. <u>Docket No. 109-3</u>. Defendant Liberty does not oppose. <u>Docket No. 109-4</u>. The Court

**grants** Plaintiffs' motion for the following reasons.

# I.     Background

## a.  Original Complaint

The following facts are derived from Plaintiffs' original complaint and are assumed to be true only for the purposes of this motion.  <u>Docket No 1</u>.  Plaintiffs MES and MCES are construction corporations, and Plaintiff George Makhoul is the sole officer, director and shareholder of MES.  <u>Id.</u> ¶ 4.  Defendant Safeco served as a surety for Plaintiffs on three construction contracts that are the subject of this litigation.  Defendant Liberty acquired Safeco in early 2008 and became responsible for all of Safeco's commitments.  <u>Id.</u> ¶ 9.  Plaintiffs are suing Safeco for failing to make payments as Plaintiff's suretor relating to the three construction contracts described as follows.  <u>Id.</u> ¶ 10.

### i.  Pyro Project Contract

In September 2006, the United States Army Corps of Engineers ("COE") entered a contract with Plaintiffs to construct a Pyrotechnics Research and Technology Facility ("Pyro Project") for $10,628,832.  <u>Id.</u> ¶ 11.  The Pyro Project was to be completed by April 17, 2008.  <u>Id.</u> ¶ 12.  Plaintiffs entered an indemnity agreement with Safeco whereby Safeco agreed to act as suretor on the Pyro Project.  <u>Id.</u> ¶ 13.   The indemnity agreement included a term that MES had the right to appeal any contract termination before Safeco could assume control over the Pyro Project.  <u>Id.</u> ¶ 59.

The COE found problems with Pyro Project specifications and changed the scope of the Pyro Project.  <u>Id.</u> ¶¶ 16-18.  Plaintiffs sought equitable adjustments to the terms of the Pyro Project so that it could comply with the COE's demands.  <u>Id.</u> ¶¶ 18-20.  The COE did not grant any of the requested equitable adjustments and beginning in January 2008, the COE began to seek Safeco's involvement in the Pyro Project as surety.  <u>Id.</u> ¶¶ 23-25.  The COE terminated

Plaintiffs' management of the Pyro Project in March 2008 when MES had completed approximately 24% of the work. Id. ¶ 17.

Safeco and Plaintiffs began an investigation into the termination of Plaintiffs' management of the Pyro Project, and Safeco indicated to Plaintiffs that they found that the COE's termination of Plaintiffs' management of the Pyro Project was improper. Id. ¶ 30. In light of Safeco's finding, Plaintiffs asked Safeco to deny the COE's request that Safeco complete the project so that the termination of Plaintiffs' management could be appealed. Id. ¶¶ 34-35.

Instead, Safeco proposed that it complete the Pyro Project with MES contributing as a site subcontractor. Id. ¶¶ 37, 43-44. MES began to assemble major subcontractors and suppliers for Safeco. Id. ¶ 45. Safeco and MES discussed particular terms under which Perini Corporation ("Perini") would provide site construction supervisors. Id. ¶ 47. Safeco negotiated with the COE and signed a takeover agreement ("Pyro takeover agreement") specifying MES as the site subcontractor and Perini as the site construction supervisors. Id. ¶ 45. After Safeco signed the takeover agreement with the COE, MES was distressed to learn that the Pyro takeover agreement gave Perini a much greater role, and MES a much smaller role, in the completion project than Safeco and MES had discussed. Id. ¶¶ 47-49. In particular, MES was distressed because under the Pyro takeover agreement, Perini was listed as responsible for providing subcontractors and suppliers that would earn Perini and Safeco approximately $1,500,000 in profits. Id. ¶ 49. At the same time, as a result of being shut out of this role by Safeco and Perini, the Pyro takeover agreement would cost MES $2,000,000. Id.

When MES complained to Safeco that it viewed the Pyro takeover agreement to be fraudulent, Safeco responded by saying that it would cut MES out of the Pyro takeover altogether unless MES gave Safeco a 20% discount on MES's fees. Id. ¶ 50. MES refused, and

Safeco terminated MES's participation in the Pyro takeover.  Id. ¶ 51.  Perini began its management of the Pyro Project in July 2008.  Id. ¶ 52.

Plaintiffs' original complaint alleges claims relating to the Pyro Project, including that Safeco breached the indemnity agreement term because Safeco:  (1) took steps to take control of the Pyro Project on receiving word that the COE claimed that MES had defaulted before MES could appeal, which it had the right to do; (2) injected itself into MES's dealings with the COE and thereby eroded any leverage that MES had with the COE in rehabilitating its position; (3) did not deny the COE's demand to complete the work when MES wanted Safeco to do this; (4) made promises to MES in order to secure MES's consent to the Pyro takeover agreement—for instance, that MES would make all technical and purchasing decisions over the course of the Pyro takeover—and then reneging on their understanding; (5) failed to mitigate the damages caused when the COE terminated Plaintiffs' management of the Pyro Project by engaging Perini for the Pyro takeover without negotiating reasonable terms and rates; (7) failed to terminate the Perini agreement once MES explained its impropriety; (8) failed to assist in talks with the COE to settle the dispute arising out of the termination of the Pyro Project contract; and (9) failed to provide MES with necessary documents that MES needed to effectively appeal the COE's termination of the Pyro Project contract.  Id. ¶¶ 55-120.  In addition, Plaintiffs' original complaint alleges that Liberty breached the indemnity agreement after the COE's termination of MES's management of the Pyro Project by paying Pyro Project subcontractors out of MES's payment bond when MES had given Liberty documentation as to why Liberty should not pay these claims;

### ii.  HEPFF Project

In September 2003, MES and Hirani Engineering ("Hirani") formed HMES, a joint

venture agreement.  Id. ¶ 140.  That same month, the COE awarded a construction contract to

HMES to build the High Energy Propellant Formulation Facility ("HEPFF Project") for a lump

sum price of $16,549,000.  Id. ¶ 141.  It was MES and Hirani's agreement that Hirani was the

majority partner of HMES; that Hirani would be responsible as a subcontractor to HMES for the

majority of the HEPFF Project for $1,605,000; and that MES would be responsible as a

subcontractor to HMES for other aspects of the HEPFF Project for $14,444,000.  Id. ¶ 144.

Plaintiffs entered an indemnity agreement with Safeco relating to HEPFF, and Safeco

agreed to provide performance and payment bonds as a surety to HEPFF for HMES.  Id. ¶¶ 142-

143.

The COE and HMES agreed that the completion date for the HEPFF Project would be

October 26, 2006.  Id. ¶ 147.  The COE later changed the scope of the HEPFF Project; those

modifications increased the COE's payment obligation by $1,966,137 to $18,515,137 and

extended the completion date to May 30, 2008.  Id. ¶ 150.  The contract provided that when the

COE issued desired modifications, HMES would request equitable modifications to the HEPFF

Project, and then six to twelve months later, the COE and HMES would negotiate a price and

completion-date extensions for the modifications.  Id. ¶¶ 151-152.

The COE's delays in payments caused subcontractors to reduce their work force, which

complicated performance of the HEPFF Project and took it beyond the completion date.  Id. ¶

158.  In August 2008, the COE contacted Safeco as the HEPFF Project suretor to seek its

involvement.  Id. ¶¶ 160-161, 163, 167.  In September 2008, the COE, MES, HMES and Safeco

met to discuss the HEPFF Project.  Id. ¶ 162.  At that meeting, MES requested that it be paid for

all the work it had performed to date.  Id.  ¶168.  Safeco refused to sign a takeover agreement,

and it urged MES and its subcontractors to continue working pursuant to the HEPFF Project.  Id.

¶ 170.  On November 8, 2008, the COE terminated the HEPFF Project.  Id. ¶¶ 164, 170.

Despite Safeco's awareness that the COE's own modifications to the HEPFF Project and payment delays contributed to the COE's dissatisfaction with HMES's performance under the HEPFF Project, Safeco decided to enter into a takeover agreement with the COE to complete the HEPFF Project ("the HEPFF takeover agreement").  Id. ¶ 166.

Plaintiffs' claims as to the HEPFF Project are very similar to those made about the Pyro Project.  Plaintiffs' original complaint alleges claims relating to the HEPFF Project, including that Safeco breached the indemnity agreement because Safeco:  (1) took steps to assume control of the HEPFF Project on hearing of MES's alleged default, despite MES's right to appeal the contract termination; (2) injected itself into MES's dealings with the COE and thereby eroded any leverage that MES had with the COE to rehabilitate its position; (3) urged MES and HMES to enter into a Memorandum of Understanding relating to HEPFF Project modifications that were not in MES and HMES's best interests; (4) pressured MES and HMES to continue working on the HEPFF Project without assurances that the COE had the necessary funding for that work; and (5) encouraged MES to bid on subcontractor work relating to the HEPFF takeover despite the fact that Safeco's bidding process was unfair, and Safeco rejected MES's offer to complete work on the HEPFF takeover.   As to Liberty, Plaintiffs allege that Liberty: (1) paid HEPFF Project subcontractors out of HMES's payment bond after the COE's termination of MES's management of the HEPFF Project despite the fact that MES had given Liberty documentation as to why Liberty should not pay these claims; (2) mismanaged MES's claims regarding the non-compliant performances of electrical and fire protection subcontractors working on the HEPFF Project, and denied MES's request that Liberty complete the work or pay for other electrical and fire protection subcontractors to do so; (3) double billed MES bonds premiums for the same risk;

(4) injected itself into the COE and MES's settlement talks in April 2009 and in other moments

regarding MES's appeal of the COE's wrongful termination of the HEPFF Project, thus denying

all Parties the possibility to settle the termination; and (5) failed to provide MES with necessary

documents that MES needed to effectively appeal the COE's termination of the HEPFF Project.

Id. ¶¶ 171-275.  Finally, Plaintiffs allege that Liberty violated the Miller Act by refusing to pay

MES from a payment bond for $1,670,661.08 worth of work MES completed on the HEPFF

Project but for which MES has yet to receive compensation, and that Safeco/Liberty acted in bad

faith by denying MES's claim against an electrician.  Id.

### iii.  ERDLF Project

In February 2005, the COE awarded MES a contract to construct an Explosive Research

and Development Loading Facility ("ERDLF Project").  Id. ¶ 276.  MES was to receive

$7,262,975 for its work on the ERDLF Project, and the completion date was to be February 27,

2009.  Id. ¶¶ 276, 300.

Plaintiffs signed an indemnity agreement with Safeco, and Safeco provided a

performance and payment bond as surety to the ERDLF Project for MES.  Id. ¶¶ 278-279.

Shortly after the COE awarded MES the ERDLF Project, the COE directed changes in

contract specifications, which in turn expanded the scope of the ERDLF Project and delayed the

progress of the work.  Id. ¶ 282.  MES requested equitable adjustments, but the COE did not

process them.  Id. ¶¶ 282-83, 288.

In December 2008, the COE, Safeco and MES met to discuss the COE's desire to involve

Safeco to complete the ERDLF Project.  Id. ¶ 290.  On December 22, 2008, the COE terminated

the ERDLF contract when it was approximately 74% complete.  Id. ¶¶ 282-283, 288, 300.

Safeco began an investigation into MES's alleged default on the ERDLF Project,

concluded that the COE's termination of MES was improper, and informed the COE of that finding.  Id. ¶ 295.  MES requested that Safeco deny the COE's demand that Safeco complete the ERDLF Project.  Id. ¶ 299.

Again, Plaintiffs raise similar claims.  Plaintiffs' original complaint alleges claims relating to the ERDLF Project, including that Safeco breached the indemnity agreement because Safeco: (1) took steps to assume control of the ERDLF Project before allowing MES to appeal contract termination, despite MES having the right to do so by an agreement term; (2) injected itself into MES's dealings with the COE and thereby eroded any leverage that MES had with the COE in rehabilitating its position; (3) requested that MES continue working on the ERDLF Project without assurances that the COE had the necessary funding for that work; (4) discouraged settlement talks between the COE and MES; and (5) failed to provide MES with necessary documents that MES needed to effectively appeal the COE's termination of the ERDLF Project.

### b.  Procedural Background To The Motion

Since the filing of the original complaint in 2009 in the District of New Jersey, Docket No. 1, this case was transferred to this District, Docket No. 54, after which Defendants requested a premotion conference as to a potential Rule 12 motion, Docket No. 63.  The Parties unsuccessfully took the case to mediation so that the aforementioned motion to dismiss was never filed pursuant to a briefing schedule.  Docket Entry 6/23/2011.  The motion to dismiss was further delayed because the Court has held the case in abeyance pending discovery motions in related case, Safeco Insurance Company of America v. M.E.S., Inc., et al., Case No. 09-CV-3312 ("Safeco, 09-CV-3312").  As a result, Defendants have never answered the original complaint nor have they otherwise responded with a Rule 12 motion.

On May 31, 2013, Plaintiffs filed this bundled motion seeking to amend their complaint. <u>Docket No. 109</u>. Plaintiffs explain that they hope to achieve three things with the complaint amendment: (1) the removal of Defendant Hirani MES Joint Venture from the case; (2) the addition of factual allegations relating to the originally pleaded nine counts using information learned over the course of discovery in a related case, <u>Safeco</u>, 09-CV-3312; and (3) the addition of three additional counts based on fraud theories, also largely premised on documents gathered in Case No. 09-cv-3312. <u>Docket No. 109-2</u>.

Plaintiffs' May 31, 2013 filing included Plaintiffs' notice of motion, <u>Docket No. 109</u>; a redlined copy of Plaintiffs' original complaint demonstrating the amendments Plaintiffs seek to make, <u>Docket No. 109-1</u>; Plaintiffs' memorandum of law in support of their motion to amend, <u>Docket No. 109-2</u>; Defendant Safeco's response in opposition to Plaintiffs' motion to amend, <u>Docket No. 109-3</u>; Defendant Liberty's response in opposition to Plaintiffs' motion to amend, <u>Docket No. 109-4</u>; and Plaintiffs' reply, <u>Docket No. 109-5</u>.

### c. Proposed Amended Complaint

The following facts are derived from Plaintiffs' proposed amended complaint and are assumed to be true only for the purposes of this motion. <u>Docket No. 109-1</u>. Generally, the proposed amended complaint adds to the allegations made and claims leveled in Plaintiffs' original complaint, so the Court incorporates by reference the background set forth, <u>supra</u>, Sections I.a, I.b. In the event that the proposed amended complaint strikes portions of the original complaint, I make note of that fact.

### i. Proposed Amendment To Add Defendants

Plaintiff's proposed amended complaint seeks to add three individual Defendants, namely, Caryn Mohan-Maxfield ("Mohan-Maxfield"), David Pikulin ("Pikulin") and Ronald

Goetsch ("Goetsch"). Id. Mohan-Maxfield is a Safeco claims representative. Id. ¶ 32. Pikulin is Mohan-Maxfield's supervisor, to whom she reported daily. Id. ¶ 33. Goestsch in turn is Pikulin's boss, "a hands on executive, intimately aware of each case and of Safeco's actions [who] insisted on approving all decisions and courses of action for Safeco." Id. ¶ 34.

### ii. Proposed Amendment To Add Factual Allegations

Plaintiff's proposed amended complaint seeks to add factual allegations explaining, as just one example, the role that the proposed individual Defendants Mohan-Maxfield, Pikulin and Goetsch had in certain acts already described in the original complaint.

Wholly new factual allegations, at least in this litigation, explain the role that Mohan-Maxfield played in coordinating the alleged legal representation of Plaintiffs by Watt Tieder Hoffar & Fitzgerald ("WTHF") in Plaintiffs' communications with the COE. Id. ¶¶ 37-51, 89. WTHF is Safeco's counsel of record not only in this litigation but the related Eastern District of New York litigation, Safeco, 09-CV-3312. Notably, Plaintiff Makhoul is suing WTHF and individual WTHF attorneys for legal malpractice, breach of fiduciary duty, tortious interference with contractual relationships and unjust enrichment in a third but related litigation in the Eastern District of New York captioned Makhoul v. WTHF, et al., 11-CV-5108.

In the proposed amended complaint, Plaintiffs expand their allegations relating to Pyro Project; in particular, Plaintiffs expand upon MES's desired plan to work as a subcontractor under Safeco in the completion of the Pyro Project and Safeco's misrepresentations that it would negotiate with the COE to make that possible; Safeco's hiring of Perini as the principal subcontractor instead, at unreasonable fees; Safeco's solicitation of proprietary MES financial information relative to the Pyro Project and use of that information to have the COE pay money to Safeco as the Pyro Project suretor; and Safeco's denial of MES's request not to complete the

Pyro Project during the pendency of MES's appeal of the COE's termination of MES's contract. Id. ¶¶ 52-89.

Throughout these new factual allegations relating to the Pyro Project, Plaintiffs make clear that they believe that WTHF's alleged legal representation of Plaintiffs is relevant. The allegations relating to WTHF make their first appearance in this litigation in Plaintiffs' proposed amended complaint. For example, Plaintiffs allege that Safeco was able to pull the proverbial wool over MES's eyes in eliciting MES's confidential financial information, which Safeco then used to persuade the COE to pay MES accounts receivables to Safeco, because WTHF, representing both Safeco and MES in the negotiations, had MES's trust as MES's attorney. See, e.g, id. ¶ 89.

Plaintiffs also expand their allegations relating to HEPFF Project; in particular, Plaintiffs allege that (1) Safeco had secretly committed to the COE that it would take over the HEPFF Project two months prior to the COE's termination of its contract with HMES; (2) Safeco, during a meeting with the COE and MES that was meant to discuss how HMES could cure HEPFF Project disputes, began to discuss a Memorandum of Understanding ("MOU") whereby the COE would pay HMES for work done as of that date (rather than letting MES continue on with the contract); (3) Safeco urged MES to sign the MOU, a Letter of Understanding ("LOU") and other documents that would simultaneously serve as a release of any claims MES might have against Safeco up to that point; and (4) Safeco arbitrarily shut MES out of the bidding process relating to Safeco's HEPFF takeover agreement with the COE, choosing instead to contract Perini as a subcontractor at higher rates than MES quoted. Id. ¶¶ 103-191.

Throughout the new factual allegations relating to the HEPFF Project, Plaintiffs also insist that WTHF's alleged legal representation of MES is relevant. For example, Plaintiffs

allege that Safeco and WTHF's negotiations with the COE were improperly adverse to MES because MES had confidence that WTHF, as MES's attorney, was acting with both Safeco's and MES's best interests in mind, never on behalf of Safeco to MES's detriment. See, e.g., id. ¶ 134.

Plaintiffs develop their allegations relating to the ERDLF Project; in particular, Plaintiffs add that Safeco had secret conversations with the COE without MES's knowledge or approval relating to the ERDLF project approximately beginning three months before the COE terminated MES's contract; that MES eventually found out about these conversations, and asked Safeco to stop the discussions, but Safeco did not; that Safeco's presence at the COE's meetings with MES regarding equitable adjustment of MES's contract was unwelcome, but Safeco attended anyway; and that Safeco improperly urged Liberty to deny payment of MES's subcontractor S.A. Comunale ("Comunale") out of a bond. Id. ¶¶ 192-242.

With respect to the new factual allegations relating to the ERDLEF Project, Plaintiffs do not make any explicit mention of WTHF's alleged representation of MES. However, the ERDLEF allegations criticize Safeco for acting in its own interest at a time when Mohan-Maxfield had convinced MES that, through the offices of WTHF, Safeco and MES were acting as a united front before the COE.

### iii. Proposed Amendment To Add Legal Claims

Plaintiffs' proposed amended complaint consolidates the forty-four legal claims it pleaded in its original complaint into twelve claims. Docket No. 109-1. Those twelve claims allege: (1) bad faith against Safeco, id. ¶¶ 243-245; (2) tortious interference with contracts against Safeco, id. ¶¶ 247-251; (3) breach of contract (the indemnity agreement) against Safeco, id. ¶¶ 252-258; (4) tortious interference with prospective economic advantage, against Safeco, id. ¶¶ 259-263; (5) breach of contract (extra work) against Safeco, id. ¶¶ 264-269; (6) quantum

meruit against Safeco, id. ¶¶ 270-277; (7) an untitled claim against Liberty and Comunale, id. ¶¶ 278-283; (8) bad faith against Safeco and Liberty, id. ¶¶ 284-288; (9) a Miller Act claim against Safeco, id. ¶¶ 289-294; (10) fraud in the inducement against Safeco, id. ¶¶ 295-301; (11) fraudulent misrepresentation and concealment against Safeco, Mohan-Maxfield and Pikulin, id. ¶¶ 302-316; and (12) civil conspiracy to defraud against Safeco, Mohan-Maxfield, Pikulin and Goetsch, id. ¶¶ 317-321.

## II. Discussion

### a. Plaintiffs May Amend Their Complaint As Of Right Per Rule 15(a)(1)(B)

"A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A)-(B).

Here, Plaintiffs are not within the 21-day window contemplated by Rule 15(a)(1)(A). Plaintiffs argue, and the Court agrees, that Rule 15(a)(1)(B) applies to permit Plaintiffs' pleading amendment because Defendants have never filed responsive pleadings in this case. Docket No. 100. In September 2010, Defendants Safeco and Liberty both filed letters requesting a premotion conference with the Court seeking to file Rule 12 motions to dismiss. Docket Nos. 62-64. Shortly thereafter, the case moved toward mediation (which was ultimately unsuccessful), Docket No. 73, and then litigation surrounding the disputed posting of collateral security, Docket No. 91, such that the Court has yet to set a briefing schedule for the Rule 12 motions to dismiss. Defendants never withdrew their request for the premotion conference seeking to file motions to dismiss. Rule 15(a)(1)(B) therefore permits Plaintiff's filing of an amended complaint. Fed. R. Civ. P. 15(a)(1)(B). This is an "amendment as of right." Matana

v. Merkin, No. 13 Civ. 1534 (PAE), 2013 WL 6147700, at *2 n.1 (S.D.N.Y. Nov. 22, 2013); see

S.S. Dweck & Sons, Inc. v. Hasbani, No. 12 Civ. 6548 (RWS), 2013 WL 3963603, at *3

(S.D.N.Y. Aug. 1, 2013) ("Defendants voluntarily withdrew their motion to dismiss on April 30,

2013 and answered the original Complaint on May 20, 2013.  Plaintiff then, pursuant to Rule

15(a)(1)(b), had twenty-one days following Defendants' answer to file an Amended Complaint

as a matter of course." (citations omitted)).   The rule "encourage[s parties] to use their right to

amend to cure any deficiency" raised in a motion to dismiss.  Clarex Ltd. V. Natixis Sec.

Americas LLC, No. 12 Civ. 7908 (PAE), 2013 WL 3892898, at *5 n.2 (S.D.N.Y. July 29, 2013).

It might be argued that Defendants' filing of the premotion conference request cut off

Plaintiffs' time to file an amended complaint because filing the letter is the equivalent of filing

the motion and satisfied the Rule 12 timing requirements.  However, significantly less effort goes

into a premotion conference letter than into a motion itself.  Allowing the amended complaint to

be filed as of right before the Court ever set a briefing schedule for the motion allows for the

more efficient use of the Court's time and resources because the Court need only meet with the

Parties once to discuss a possible motion, and the need for the motion may be obviated if the

amended pleading deals with Defendants' concerns.  In this case, where the case was stayed, it is

even more sensible to allow the amended pleading before discovery gets underway or any statute

of limitations runs.

### b.  Plaintiffs May Amend Their Complaint Because "Justice So Requires" Per Rule 15(a)(2)

Under another view of the Federal Rules and the District Judge's Individual Rules, the

Defendants' filing of the premotion conference letter was enough to cut off the Plaintiffs' right to

amend as of right.  Nonetheless, Plaintiffs will be allowed to amend because "justice so

requires."  In cases where a party cannot amend its pleading as a matter of course, "a party may

14

amend its pleading only with the opposing party's written consent or the court's leave. The court

should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "This permissive

standard is consistent with our strong preference for resolving disputes on the merits." Williams

v. Citigroup, Inc., 659 F.3d 208, 212-13 (2d Cir. 2011).

The Second Circuit applies a "permissive standard" to complaint amendments. "[J]ustice

does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to

amend would unduly prejudice the opposing party." S.S. Silberblatt, Inc. v. East Harlem Pilot

Block—Building 1 Housing Development Fund Co., Inc., 608 F.2d 28, 42 (2d Cir. 1979); see

Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)

("'[U]ndue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or]

futility of amendment' will serve to prevent an amendment . . . ." (citation omitted)).

Defendant Safeco argues that nearly all of these apply in the present case to preclude

Plaintiffs' proposed amendments, which Defendant Safeco calls "extremely untimely, futile,

offered for an improper purpose and would unduly delay the current proceedings." Docket No.

109-2. This Court disagrees and finds that even if Plaintiffs did not have the right to amend its

complaint as a matter of course in this case, as discussed supra, Section II.a., "justice so

requires" leave to amend in this case. Id.; Absolute Activist Value Master Fund Ltd. v. Ficeto,

677 F.3d 60, 71 (2d Cir. 2012).

### i. The Proposed Amendments Are Not Futile

### 1. Count Nine

Safeco argues that Count Nine of Plaintiffs' proposed amended complaint—a Miller Act

violation, against Safeco alone—is futile because the Miller Act does not allow a general

contractor to sue a surety thereunder.  Docket No. 109-3.  Plaintiffs' Count Nine Miller Act

claim in its proposed amended complaint deals with HEPFF, the contract which the COE

awarded to HMES as a joint venture.  Docket No. 109-1 ¶¶ 289-294.  (The Count Nine Miller

Act claim does not mention the Pyro Project or the ERDLEF Project.  Id.)  In Count Nine,

Plaintiffs drop Hirani, MES's joint venture partner in HMES, as a defendant, such that Plaintiffs'

proposed amended complaint's Miller Act claim raises a Miller Act claim against Safeco alone.

Id.

    The Miller Act requires a government contractor to furnish a performance bond and a

payment bond when the federal government awards the contractor a contract of more than

$100,000 to construct any public building or public work.  40 U.S.C. §§ 3131(b)(1), (b)(2).  A

performance bond is furnished to the surety "for the protection of the Government."  40 U.S.C. §

3131(b)(1).  A payment bond is furnished to the surety "for the protection of all persons

supplying labor and material in carrying out the work provided for in the contract for the use of

each person."  40 U.S.C. § 3131(b)(2).  The Miller Act provides who has the right to bring a civil

action thereunder, i.e., "[e]very person that has furnished labor or material in carrying out work

provided for in a contract for which it a payment bond is furnished under section 3131 of this

title and that has not been paid in full within 90 days after the day on which the person did or

performed the last of the labor or furnished or supplied the material for which the claim is made .

. . ."  40 U.S.C. § 3133(b)(1).

    There appears to be no dispute between the Parties that Miller Act performance and

payment bonds had to be posted for the HEPFF project as it was a construction contract awarded

by the COE for a public building for the sum of $16,549,000.  Docket No. 109-1 ¶ 98.  Plaintiffs

allege that in 2003, they obtained payment bonds from its major electrical subcontractor in the

amount of $1,000,000, and from its major fire protection subcontractor, Comunale, in the amount of $1,300,000.  Docket No. 109-1 ¶¶ 171, 179.  MES also alleges that it had its own payment bond because it served as a subcontractor to MES.  Id. ¶ 189.

Plaintiffs' proposed amended complaint is confusing at times.  Plaintiffs say in one paragraph relating to the electrical and fire protection subcontractors that Safeco's requirement of the payment bond "forc[ed] MES to pay . . . ."  Id. ¶ 170.  Later, Plaintiffs say that the electrical subcontractor and Comunale, the fire protection subcontractor, provided MES with bonds from Liberty, which at the time was a separate and an independent entity from Safeco.  Id. ¶¶ 172, 179.  Plaintiffs allege that although Safeco was very liberal in its dispensation of payment bonds to subcontractors like the electrical subcontractor and Comunale, the fire protection subcontractor, it did not properly dispense funds from a payment bond to MES for its performance as a subcontractor to HMES under the HEPFF Project.  Id. ¶ 190.

Using the above facts as a backdrop, Plaintiffs' Count Nine alleges a Miller Act claim against Safeco.  First, Plaintiffs allege that "MES provided labor and material to HMES pursuant to the terms of a subcontract, but HMES failed to pay MES fully."  Docket No. 109-1 ¶ 290.  Next, Plaintiffs allege that "Safeco paid some of MES' suppliers and subcontractors for claims instituted against Safeco's payment bond, but refused to make payment to MES for work performed by MES."  Id. ¶ 291.  "Safeco refused in bad faith to make payment to MES for its claim under the payment bond for work performed by MES."  Id. ¶ 292.  "WHEREFORE, plaintiffs request a judgment against Safeco for work performed by MES and its subcontractors on the HEPFF Project for the months of June to October 2008 . . . as well as for additional work performed by MES on the project, submitted as Requests for Equitable Adjustments and claims . . . ."  Id. ¶ 294.  MES's Miller Act theory appears to be that it can sue Safeco for payment bond

reimbursement because first, payment bonds were executed for the HEPFF contract between the

COE and HMES in 2003 for HEPFF subcontractors, Docket No. 109-1 ¶ 170, and second, MES

performed work as a subcontractor to HMES on the HEPFF Project, Docket No. ¶ 189.

> According to Safeco, HMES as
>
> [t]he [general] contractor is . . . the Principal on the payment bond, which
> provides that [HMES] and [Safeco] jointly agree to pay valid claims submitted by
> [HMES's] unpaid subcontractors and suppliers.  Importantly, [Safeco's] liability
> to pay such claims is considered a secondary obligation, which the surety is
> generally expected to perform if the Principal fails in the first instance to perform
> its so-called principal obligation to pay; [Safeco], in turn, is entitled to full
> recourse, including indemnity and exoneration, from [HMES] to the extent called
> upon to perform the payment obligation.

Docket No. 109-3 (citing Restatement of Suretyship & Guar. (3d) §§ 37-49)).  Accordingly,

Safeco did not have to pay the principal on the bond.  More particularly, Safeco argues the Miller

Act claim is futile as MES is not a proper claimant under the Miller Act.  Docket No. 109-3.

Safeco argues that case law precludes MES, as an individual member of the joint venture

member general contractor HMES, from suing Safeco.  Indeed, in U.S. ex rel. PCC Const., Inc.

v. Star Ins. Co., 90 F. Supp. 2d 512, 518-19 (D.N.J. 2000) (citing U.S. ex rel. Woodington

Electric Co, Inc., 545 F.2d 1381, 1382 (4th Cir. 1976)), the court held that "sureties are not liable

for monies expended on the contract by a partner or joint venture of the general."  See U.S. ex

rel. Johnson Pugh Mechn. Inc. v. Landmark Constr., 318 F. Supp. 2d 1057, 1069 (D. Colo. 2004)

("The Miller Act was not designed to protect such prime, or general contractors.  Therefore, a

partner or a joint-adventurer in the general contract itself, or a portion of it, would not be one of

those protected by the Miller Act.").

Plaintiffs persist, stating that HMES "was not a true partnership for the purposes of the

Miller Act."[1] Docket No. 109-2. As Plaintiffs correctly point out, state law requires an analysis

of the Parties' conduct, as opposed to a label, in determining whether a business deal is a joint

venture. [2] New York law holds that "a joint venture is formed when (a) two or more persons

enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to

be joint venturers; (c) each contributes property, financing, skill, knowledge or effort; (d) each

has some degree of joint control over the venture; and (e) provision is made for the sharing of

both profits and losses." SCS Comm'ns, Inc. v. Herrick Co., Inc., 360 F.3d 329, 342 (2d Cir.

2004). Plaintiffs's pleading satisfies only four of the five of the elements of a joint venture

---

[1] This Court notes that this is not a circumstance in which Safeco is unilaterally attempting to cast HMES as a joint venture for Safeco's own benefit. Plaintiffs' proposed amended complaint labels the MES-Hirani union of HMES as a joint venture time and time again. See, e.g., Docket No. 109-1 ¶¶ 99 ("On September 12, 2003, the U.S. Small Business Administration approved [HMES] as a Joint Venture Agreement"), 130 ("In an attempt to blackmail the Joint Venture [referring to HMES], Safeco threatened the Joint Venture . . . unless the Joint Venture, including Hirani and MES . . ."), 244 ("Safeco breached its duty of good faith and fair dealing toward MES, MCES and George Makhoul . . . [because i]t reneged on its agreement with the Joint Venture. . ."). In addition, at a discovery conference on December 18, 2012, MES's counsel argued for a joint discovery privilege between MES and Hirani, telling the Court "Your Honor, these two entities [MES and Hirani] were part of a joint venture which is a partnership. They clearly had a common interest." Docket No. 99 at 115:16-18. Later, during the same conference, MES's counsel stated "[D]uring the 2008 time frame, the project in which they were involved [HEPFF], HMES, which is the joint venture which is comprised of Hirani and MES, were involved in a project together as joint ventures and . . . [s]o they all had a common interest in defending and protecting themselves against potential litigation of [Safeco and the COE]." Id. at 116:2-14. Plaintiffs' position as to Count Nine that HMES was not technically a partnership or joint venture is inconsistent with the record.

[2] I find that New York law is applicable. Plaintiffs stated that they "do not address the choice of law analysis [between New York and New Jersey] at this point because, as will be discussed, the legal principles are the same in both states for the issues raised in this motion." Docket No. 109-2. District Judge Allyne Ross, in her May 19, 2010 Opinion and Order ruling on a summary judgment motion in related case, Safeco, 09-CV-3312, which deals with the same three contracts—Pyro, HEPFF and ERLDEF—already applied New York law: "[Safeco] asserts that New York law controls this diversity action. [MES's] briefs have not addressed which jurisdictional law governs, but have assumed as much. As such, New York law is applied." Safeco, 9-CV-3312, Docket No. 80 at 14 n.3 (citing Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000), for the proposition that "[t]he parties' briefs assume that New York law controls and such implied consent is sufficient to establish choice of law").

required by New York law for HMES to be considered a joint venture. Plaintiffs satisfy the first element alleging that MES and Hirani entered into an agreement to carry on a venture for profit. Docket No. 109-1 ¶¶ 99 ("On September 23, 2003, MES and Hirani . . . formed a New Jersey Partnership called Hirani-MES J[oint]V[enture] . . . ."), 101-02 (detailing the amount of money that Hirani and MES could expect to be paid under the JV). Plaintiffs satisfy the second element alleging MES and Hirani's intent to be joint venturers insofar as MES and Hirani called their partnership a "joint venture." Id. ¶ 99. Plaintiffs satisfy the third element alleging that MES and Hirani each contributed skill and effort to the joint venture by performing work on the HEPFF Project. Id. ¶¶ 101-02. Plaintiffs satisfy the fourth element alleging that both Hirani and MES had some degree of control over the venture because Hirani was the managing partner with 51% majority control, while MES had 49% control. Id. ¶ 100; see, e.g, id. ¶ 117 (describing that MES's staff met at the COE's New York office in order to discuss how HMES would respond to the COE's cure notice).

Plaintiffs' complaint fails to satisfactorily plead the fifth element. Plaintiffs allege that Hirani and MES's contract provided that the COE's total $16,549,000 payment would be distributed in the following way: $1,605,000 would go to Hirani for its work under the Joint Venture Agreement, and $14,444,000 would go to MES for its work under the Joint Venture Agreement. Id. ¶¶ 101-02. Although this allegation explains the compensation that Hirani and MES would receive as a result of the HMES business deal between them, the allegation does not contemplate that Hirani would bear losses suffered by MES relating to its portion of the work, or vice versa. Absent this pleading, Safeco must explore through discovery whether the agreed-upon distribution of unexpected profit or loss between Hirani and MES under the joint venture agreement can be said as a matter of law to establish that HMES was a joint venture.

Because Plaintiffs may not be disqualified by the joint venture defense raised by Safeco to the Miller Act claim, Plaintiffs' Count Nine Miller Act claim against Safeco survives Safeco's attempt to cast it as futile at the pleading stage.

## 2. Count Ten

Safeco argues that Count Ten of Plaintiffs' proposed amended complaint—fraud in the inducement, against Safeco—is futile because it "attempts to repackage as a tort claim what amounts to, and has already been asserted as, a breach of contract claim in Count One" of Plaintiffs' proposed amended complaint. Docket No. 109-3.

The Parties agree that the elements of a common law fraud claim are proof: (1) that the defendant made a representation (2) as to a material fact (3) which was false (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely (7) in ignorance of its falsity (8) to his injury. Docket Nos. 109-2 at 6, 109-3 at 12 (both citing to Brown v. Lockwood, 76 A.D. 2d 721, 730 (2d Dep't 1980)). Safeco argues that Plaintiffs have not alleged the eight requisite elements of fraud as described above.

The Court finds that Plaintiffs have adequately pleaded the eight fraud elements. Plaintiffs allege in Count Ten that Safeco represented that it would issue bonds to MES on the condition that "MES [had] the exclusive right to determine whether MES, on behalf of itself and Safeco, would defend, pay, or appeal a claim made by a third party or an Obligee, and/or a suit brought against MES and/or Safeco under any bond written by Safeco that is subject to the Indemnity Agreement." Docket No. 109-2 ¶ 296. Plaintiffs further allege that this representation was false insofar as Safeco did not give MES the aforementioned right, and that Safeco knew it was false because Safeco "had no intention of honoring its agreement with

respect to the handling of claims by MES" "as evidenced by its refusal to honor its agreement and its denial that it ever made such an agreement." Id. ¶ 297. Plaintiffs claim that Safeco's representation was made for the purposes of inducing Plaintiffs' reliance; that Safeco's representation was material because George Makhoul, acting as MES's agent, was induced to sign the indemnity agreement as a result of Safeco's representation, not knowing that it was false; and that MES suffered injury as a result. Id. ¶ 298.

Next, Safeco argues that Plaintiffs have not alleged a specific statement made by a specific person such that Plaintiffs have not met the Rule 9(b) requirement that pleadings be made with specificity. Docket No. 109-3; Fed. R. Civ. P. 9(b). Safeco's allegation that Plaintiffs have not named a specific person is not correct. Plaintiffs have alleged that Safeco's representatives Steven Garon and Ira Sussman allegedly made the fraudulent representation. Docket No. 109-1 ¶ 299. Plaintiffs' proposed amended complaint states that Garon and Sussman encouraged Makhoul to sign the HEPFF indemnity agreements by stating verbally (although this apparently does not appear in the contract's text) that MES would have the exclusive right to decide whether to defend, pay or appeal a claim under that agreement. Id. ¶¶ 199-200.

Safeco's argument that Plaintiffs have not specified the statements that Plaintiffs contend were fraudulent is also incorrect. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (stating that plaintiffs must specify a fraudulent statement in pleading). Plaintiffs describe Garon and Sussman's statements as "assurances" that "MES [would] have the exclusive right to determine whether MES, on behalf of itself and Safeco, would defend, pay, or appeal a claim" made in relation to HEPFF. Id. ¶ 296; see Giuliano v. Everything Yogurt, Inc., 819 F. Supp. 240, 244 (E.D.N.Y. 1993) ("[T]he complaint need not specify the time, place and content of each mail communication . . . it is enough to plead the general content of the misrepresentation

without stating the exact words used[.]").  In compliance with the <u>Giuliano</u> rule, Plaintiffs' fraud

allegations in this case include a summary of the general content of the misrepresentation, the

specific day that the misrepresentation was made, the specific time, and the specific persons who

made the statements.  Plaintiffs have pleaded with sufficient particularity for Safeco to be on

notice of the alleged fraud.

Safeco next complains that Plaintiffs' Count Ten is nothing more than a breach-of-

contract claim impermissibly cast as a fraud-in-the-inducement claim, and that the tort claim

must fall as a result.  <u>Docket No. 109-3</u>.  Safeco relies on <u>Telecom Intern. America, Ltd. v.</u>

<u>AT&T Corp.</u>, 280 F.3d 175, 196 (2d Cir. 2001), in which the Second Circuit held that "where a

fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition

only of an allegation that defendant never intended to perform the precise promises spelled out in

the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for

breach of contract."  "[S]imply dressing up a breach of contract claim by further alleging that the

promisor had no intention, at the time of the contract's making, to perform its obligations

thereunder, is insufficient to state an independent tort claim."  <u>Id.</u>

Safeco explains its position by pointing to Count One of Plaintiff's proposed amended

complaint, which is labeled a "bad faith claim" against Safeco, in which Plaintiffs allege that

Safeco "induced plaintiffs to enter into an Indemnity Agreement and to procure bonds pursuant

to the agreement, but never intended to comply with the conditions proposed by plaintiffs and

accepted by Safeco."  <u>Docket No. 109-1</u> ¶ 244.  Despite Plaintiffs' calling Count One a bad-faith

claim, Safeco is correct that Count One is a breach-of-contract claim because,  <u>inter alia</u>,

Plaintiffs allege in Count One that they are not contractually bound to indemnify Safeco for the

money Safeco paid out of the bonds to third parties because Safeco breached the indemnity

agreements by operating in bad faith in administering those bond payouts.  Id.

Plaintiffs counter that their fraud claim is permissible despite the breach-of-contract claim because it falls within an exception to Telecom Intern. Am., Inc., which is that the fraud claim involves "a fraudulent representation collateral or extraneous to the contract."  Docket No. 109-5 (citing to Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).  Plaintiffs argue that "[a] claim arising out of such a fraudulent inducement is considered to rest upon an independent tortious act.  The plaintiff sues not for any breach of contract but for injuries suffered as a result of the defendants' conduct which is separate and distinct from the formal contract."  Id. (citing Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y. 2d 403, 408 (N.Y. 1958)).  In invoking this exception, Plaintiffs implicitly concede or clarify that it is their position that the fraudulent inducement for MES to enter the indemnity agreement—that MES would have the exclusive right to decide whether to defend, pay or appeal any claim—was a sham inducement and extraneous to the contract, but that this did not become a term of the contract.  The collateral-or-extraneous exception to the rule against contemporaneous contract and fraud claims depends on stand-alone fraud claim being premised on what was a "representation of present fact, not of future intent."  Deerfield Comm'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y. 2d 954, 956 (N.Y. 1986).  In other words, for a fraud claim and a breach-of-contract claim to coexist on facts such as those alleged here, the alleged inducement can only be said to have induced entry into the contract but cannot be said to have simultaneously become a contract term.

In light of the foregoing, this Court understands that Plaintiffs are withdrawing the one allegation among nineteen in its Count One breach-of-contract claim stating that Safeco breached the Parties' contract when "[i]t induced plaintiffs to enter into an Indemnity Agreement and to

procure bonds pursuant to the agreement, but never intended to comply with the conditions proposed by plaintiffs and accepted by Safeco," so that one allegation is deemed withdrawn. Docket No. 109-1 ¶ 244(a). This obviates the problem Safeco raises with Count Ten. Had Plaintiffs insisted upon leaving the inducement allegation as the underpinning of a breach-of-contract claim, suggesting that the alleged inducement could pull double duty as an enforceable contract term, this Court would be compelled to deny the addition of Count Ten.[3]

Finally, Safeco argues that Count Ten is time barred. Docket No. 109-3. Safeco does not dispute that Count Ten would be timely had it been included in the original 2009 complaint. Safeco's argument fails because although it is true that Plaintiffs did not have a fraud-in-the-inducement claim in their original complaint, Plaintiffs did already allege all the underlying facts to Count Ten in that August 2009 document. See, e.g., Docket No. 1 ¶¶ 58, 59. Safeco cannot rightly claim that they have been prejudiced by lack of notice. Safeco cites to Slayton v. American Exp. Co., 460 F.3d 215, 228 (2d Cir. 2006), for the proposition that relation back for the purposes of the statute of limitations is appropriate where "an amended complaint does not allege a new claim but renders prior allegations more definite and precise," but the more relevant Slayton holding is that under Rule 15, the "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." Here, Plaintiffs meet the Slayton test, and Count Ten is not time barred.

### 3. Count Eleven

Safeco argues that Count Eleven of Plaintiffs' proposed amended complaint—fraudulent misrepresentation and concealment, against Safeco, Mohan-Maxfield and Pikulin—is futile

---

[3] I do not reach Safeco's argument that the oral representations of Garon and Sussman cannot be read to be a contract term because of the parol evidence rule as this argument is now moot.

because Plaintiffs fail to allege the requisite elements of a claim for fraudulent misrepresentation and concealment generally, and because Plaintiffs fail to allege facts against specific Safeco employees that would give rise to individual liability.  Docket No. 109-3.

In related case Makhoul, 11-CV-5108, Plaintiff Makhoul is suing WTHF for legal malpractice arising out of what he claims were WTHF attorneys' representations to him that WTHF would represent both Safeco and MES before the COE despite the fact that Safeco and MES clearly did not have aligned interests.  Now, Plaintiffs in this litigation seek to raise similar allegations against Safeco, Mohan-Maxfield and Pikulin as a fraudulent misrepresentation claim.

Safeco argues that this claim cannot stand because Plaintiffs do not allege any false representation of a material fact.  Docket No. 109-3.  To the contrary, the Court finds some alleged statements that pass muster.  For example, on January 31, 2008, Mohan-Maxfield "argued that MES should allow itself to be represented by WTHF in all dealing with the COE going forward," implying no conflict existed, Docket No. 109-1 ¶ 37; and "Pikulin asked Makhoul and Hirani to allow Brasco to continue to represent HMES' interests in dealing with the Corps at the Cure Notice meeting" around September 2008, id. ¶ 115.  As a result, "George Makhoul was persuaded by Mohan-Maxfield and Sgarlata to rely on WTHF to represent MES starting on March 26, 2008."  Id. ¶ 39.  It is plain that the reasonable implication of Mohan-Maxfield and Pikulin's allegedly urging Plaintiffs to retain WTHF as their counsel is that WTHF would so advocate for MES, and Plaintiffs allege that they relied on those statements to their detriment.  Therefore, Plaintiffs have satisfied the fraud pleading requirement of specific false representations of a material fact, if barely.

Safeco argues that Plaintiffs' allegations regarding Mohan-Maxfield and Pikulin misrepresentations about WTHF's representation of Plaintiffs are promissory in nature and do

not simultaneously allege that "any individual speaker did not intend to fulfill any promise at the time such promise was made." Docket No. 109-3. Safeco argues that Mohan-Maxfield and Pikulin's statements thus are non-actionable under fraud principles. Id. Plaintiffs allege immediately after their allegations regarding Mohan-Maxfield that Makhoul believed "the representations of Mohan-Maxfield" and that "Makhoul would have never shared [MES information with WTHF attorneys] had he known that Safeco and WTHF were colluding to advance the interest of Safeco, at the expense of MES' interest and to cause serious damage to MES and George Makhoul." Docket No. 109-1 ¶ 43. This allegation implies that there was an understanding between Safeco and WTHF that they would collude against MES contemporaneously with Mohan-Maxfield's representations, such that Mohan-Maxfield's statements were a misrepresentation the moment they were made. Similarly, Plaintiffs' proposed amended complaint alleges that shortly after Pikulin "asked Makhoul and Hirani to allow Brasco to continue to represent HMES' interest in dealing with the Corps," "Brasco met with Mohan-Maxfield and David Pikulin from Safeco and then met with Makhoul and Hirani. He advised MES and Hirani . . . not to contradict his representation of HMES in order to maintain a unified front with Safeco defending against the Corps." Id. ¶¶ 115-16. Then, during a meeting held later that day, Safeco and Plaintiffs' interests were already adverse, as Safeco had had a secret meeting with the COE two weeks earlier, calling into question WTHF's purported loyalties. Id. ¶ 118. The import of Plaintiffs' allegations is that Mohan-Maxfield, Pikulin and Brasco colluded to confuse Plaintiffs as to the nature of WTHF's legal representation of Plaintiffs from the inception of that alleged arrangement. This undermines Safeco's argument that the misrepresentations were about the future and not actionable.

Safeco next argues that a fraud claim must include "reasonable reliance" upon the false

representation of a material fact, and that Plaintiffs could not have possibly reasonably relied upon any representation that WHTF would represent Plaintiffs and Safeco simultaneously and equally, given that Plaintiffs and Safeco had radically contradictory interests in this dispute with the COE.  Docket No. 109-3.  While this argument appeals to common sense and may in fact be correct, it is unavailing at this pleading stage.  In related case, Makhoul, 11-CV-5108, District Judge Gleeson denied WTHF's motion to dismiss Makhoul's legal practice claim against it. District Judge Gleeson permitted additional discovery on the question of whether an attorney-client relationship existed between WTHF and MES, and stated that the question was most proper for resolution on summary judgment on the close of discovery.

Now, Safeco wishes this Court to find that it would have been unreasonable for Plaintiffs to believe Mohan-Maxfield and Pikulin when they informed Plaintiffs that WTHF would represent Plaintiffs and Safeco jointly before the COE.  However unlikely that proposition seems—District Judge Gleeson did express a great deal of skepticism about it in a hearing in Makhoul, 11-CV-5108, Docket No. 54—the fact remains that District Judge Gleeson permitted discovery and advised summary judgment determination of that question thereafter.  This Court is presented with almost identical circumstances.

Accordingly, this Court finds that as Plaintiffs allege in their proposed amended complaint that they reasonably relied on Mohan-Maxfield and Pikulin's representations that WTHF would jointly represent Safeco and Plaintiffs, this claim survives Safeco's motion to dismiss on that grounds.[4]

Finally, Safeco argues that Mohan-Maxfield and Pikulin cannot be individually liable for

---

[4] For the same reason, Safeco's opposition to Plaintiffs' general inclusion of factual allegations regarding WTHF's purported representation throughout their proposed amended complaint, even those claims that are not centrally premised upon WTHF's purported attorney-client relationship with Plaintiffs, is rejected.

actions taken in the course of their employment or on behalf of the company because case law states that employees of a company cannot be held liable for their actions taken or duties discharged in the course of their employment or on behalf of the company.  <u>Docket No. 109-3</u>. Safeco's argument fails because Plaintiffs' allegations against Mohan-Maxfield and Pikulin are such that Mohan-Maxfield and Pikulin's alleged actions may not have been within the scope of their employment with Safeco.  <u>See</u> <u>Cohen v. Davis</u>, 926 F. Supp. 399, 404 (S.D.N.Y. 1996) ("A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest.").

### 4.  Count Twelve

Safeco argues that Count Twelve of Plaintiffs' proposed amended complaint—civil conspiracy to defraud, against Safeco, Mohan-Maxfield, Pikulin and Goetsch—is futile because Plaintiffs fail to allege the requisite elements of a civil conspiracy claim generally, and because Plaintiffs fail to allege facts against specific Safeco employees that would give rise to individual liability.  <u>Docket No. 109-3</u>.  Further, Safeco alleges that the intra-corporate conspiracy doctrine precludes a civil conspiracy claim against employees of the same corporation.  <u>Id.</u>

"It is well-settled that New York law does not recognize an independent cause of action for civil conspiracy."  <u>Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC</u>, 223 F. Supp. 2d 474, 490 (S.D.N.Y. 2002). "A plaintiff must first establish an independent, actionable tort."  <u>Id.</u>  Here, Plaintiffs have achieved this threshold requirement with Count Eleven's fraudulent misrepresentation and concealment claim against Mohan-Maxfield and Pikulin. <u>Docket No. 109-1</u> ¶¶ 302-316.

Once an independent, actionable tort is properly pleaded, as is the case here, Plaintiffs

must plead the requisite elements of a civil conspiracy claim, which are (1) an agreement between two or more people; (2) an overt act committed in furtherance of the agreement; (3) the participation of the individuals in furtherance of the plan or purpose; (4) resulting in damage or injury.  See Bigio v. Coca-Cola Co., 675 F.3d 163, 176 (2d Cir. 2012).  Plaintiffs allege facts that satisfy these elements as to all Defendants.  As to the first element, an agreement, Plaintiffs allege that "Safeco, Mohan-Maxfield and Pikulin knew their representations [regarding WTHF] to be false and intended to defraud MES and Makhoul at the time their representations were made because Mohan-Maxfield and Vivian Katsantonis, Esq., a parner at WTHF . . . intended to sue MES at the time they first made the representations [that WTHF would represent Safeco and MES jointly], namely in March 2008."  Docket No. 109-1 ¶ 308; see Van Dunk v. Brower, Case No. 11-CV-4563, 2013 WL 5970172, at *15 (S.D.N.Y. Nov. 7, 2013) (stating that "alleging an explicit agreement is not required," but dismissing the conspiracy claim because neither was there any allegation of a "tacit understanding to carry out the prohibited conduct").  In another allegation, Plaintiffs state that "Goestch agreed with the plan to induce plaintiffs to rely on the legal representation of WTHF and the representation of Mohan-Maxfield and Pulin to that end . . . ."  Id. ¶ 319.  Plaintiffs allegations satisfy the second element of civil conspiracy, an overt act in furtherance of the agreement, with respect to Mohan-Maxfield and Pikulin insofar as Plaintiffs aver that Mohan-Maxfield and Pikulin falsely represented to Plaintiffs that WTHF was representing Safeco and MES jointly.  Id. ¶¶ 307-08.  Plaintiffs allege that Goetsch, Pikulin's supervisor, "insisted on approving all decisions and courses of action for Safeco."  Id. ¶ 34.  Plaintiffs satisfactorily allege the third element of civil conspiracy, participation of Defendants Mohan-Maxfield, Pikulin and Goetsch in furtherance of the plan or purpose, using the same allegations as satisfy the overt-act element.  Id.  Finally, Plaintiffs allege damage or injury in

WTHF's purportedly negotiation with the COE to Plaintiffs' detriment because Plaintiffs let their guard down believing that WTHF was proceeding in Plaintiffs' best interest.  See, e.g., id. ¶¶ 41 (stating that WTHF convinced Makhoul to abandon seeking redress relating to the COE's termination of the Pyro Project),  52-77 (stating that WTHF and Safeco then led Plaintiffs to believe that they would be part of Safeco's takeover of the Pyro Project, but that Safeco deprived Plaintiffs of meaningful participation).  In sum, Plaintiffs have adequately pleaded civil conspiracy as to Defendants Mohan-Maxfield, Pikulin and Goetsch.

Safeco argues that even if that is the case, the intra-corporate conspiracy doctrine precludes Count Twelve's civil conspiracy claim against Safeco's employees as individuals. Docket 109-3.  The problem with Safeco's argument is that although Plaintiffs' civil conspiracy claim does name Safeco employees, Plaintiffs also allege other corporate entities were involved in shutting MES out of the various projects, namely Perini Corporation ("Perini") (which succeeded Plaintiffs as project site supervisors) and Cashin Spinelli & Ferretti, LLC ("CSF") (Safeco's surety consultant).  For example, Plaintiffs allege that Safeco refused to award a subcontract to MES on the Pyro Project and gave it to Perini instead despite the fact that Perini charged $4,000,000 more than MES's cost estimate to provide identical subcontractors and suppliers.  Docket No. 109-1 ¶ 63.  Plaintiffs' allegations that Safeco took a $4,000,000 loss to work with Perini instead of MES implies that Safeco and Perini conspired to squeeze MES out of the deal; otherwise, the Safeco-Perini relationship makes no sense as a business deal as per Plaintiffs' bare-bones description.   A further allegation that there was a conspiracy between Safeco and Perini is that "[t]he contract fee was nine percent, more than double the standard fee charged by the industry for that type of contract . . . ."  Id. ¶ 64.  All of this ties into Plaintiffs' allegations regarding the purported fraudulent representation that WTHF legally represented

Plaintiffs because "WTHF represented both Safeco and Perini in reviewing, approving and signing the contract, and . . . Perini's contract was signed by Safeco without being reviewed by any other attorney or construction professional."  Id. ¶ 61.  The claim stands for now.

### ii.  The Proposed Amendment Does Not Appear To Be Offered In Bad Faith

A "rule in our circuit is to allow a party to amend its complaint unless the nonmovant demonstrates . . . bad faith."  City of N.Y. v. Group Health, Inc., 649 F.3d 151, 157 (2d Cir. 2011).   Defendant Safeco argues that Plaintiffs seek to amend their complaint in bad faith here because it is trying to "weave into essentially every one of its original claims, the frivolous claims" alleging WTHF's legal malpractice.  Docket No. 109-3.  As discussed above, this issue is alive in related case Makhoul, 11-CV-5108:  Once the issue of whether an attorney-client relationship existed between Makhoul and WTHF is determined on summary judgment in that case, Safeco may bring that ruling to this litigation and argue what impact, if any, it should have on Plaintiffs' claims.

Safeco also argues that Plaintiffs' proposed Counts Ten, Eleven and Twelve were made in bad faith because Plaintiffs must have known the Counts' legal shortcomings and that the Counts were futile.  Id. at 3.  This, according to Defendant Safeco, "amounts to nothing more than a transparent and wholly improper attempt to bog this litigation . . . down with distractions, in the hopes of gaining some improper tactical advantage, including among others, further costly delay and prejudice to Safeco."  Id.  As the amendments are not futile, I find that Safeco's argument that Plaintiffs made them in bad faith knowing they were futile is unconvincing.

Plaintiffs have not filed their motion to amend in bad faith.

### iii.  The Proposed Amendment Does Not Prejudice Defendant Safeco

"Prejudice to the opposing party if the motion is granted has been described as the most

important reason for denying a motion to amend." New Hampshire Ins. Co. v. Total Tool Supply, Inc., 621 F. Supp. 2d 121, 123 (S.D.N.Y. 2009). Defendant Safeco claims that it would suffer prejudice because MES is attempting to "completely alter the positions it has held in this case over the past three years by (i) deleting factual allegations . . . and (ii) injecting numerous new allegations regarding the alleged joint representation throughout its complaint that serve no purpose but to delay proceedings and to harass and prejudice Safeco, including Safeco's executives and employees." Docket No. 109-3.

It is true that Plaintiffs' proposed amended complaint comes many years after the litigation's initial filing, but

> [d]elay in seeking leave to amend a pleading is generally not, in and of itself, a reason to deny a motion to amend. However, the Court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay . . . . Leave to amend a complaint will generally be denied when the motion to amend is filed solely in an attempt to prevent the Court from granting a motion to dismiss or for summary judgement, particularly when the new claim could have been raised earlier.

New Hampshire Ins. Co., 621 F. Supp. 2d at 123-24. The mere fact that this litigation is three years old does not establish that Defendant Safeco would suffer prejudice if the complaint were amended. First, Plaintiffs state that some of the proposed amended factual allegations were not previously known to them because they were revealed in the context of discovery in the related case Safeco, 09-CV-3312. Second, a review of Plaintiffs' redlined proposed amended complaint shows that many of the proposed amendments add details to allegations that Plaintiffs made in their earlier complaints.

There is an exception to this, which is Plaintiffs' proposed amended allegations regarding Defendants' fraudulent representations that WTHF would represent Plaintiffs and Safeco alike in their dealings with the COE. Rather than adding detail to factual allegations that pre-existed this

motion in this litigation, these proposed amendments inject a broad new angle to Plaintiffs' approach to this litigation. Even still, this Court does not find that permitting such allegations would inflict prejudice upon Defendants. After all, Defendants have been on notice that Plaintiffs were alleging these facts in the context of related litigation <u>Makhoul</u>, 11-CV-5108. Furthermore, expansive discovery—at this writing, Defendants have served some 35,511 pages of documents, 19 interrogatory responses and 76 admissions—has already been conducted in <u>Makhoul</u>, 11-CV-5108, regarding allegations that WTHF represented Plaintiffs. <u>See</u> <u>Makhoul</u>, 11-CV-5108, <u>Docket No. 67</u>. It is true that the Parties are still embroiled in a dispute regarding Defendants' privilege log in that case, but discovery is progressing .

Most critical to this Court's belief that Plaintiffs' amendment of their complaint would not prejudice Defendant Safeco is the fact that this litigation is still at a stage where such amendment would not likely cause delay. Defendants have not filed an answer or any other responsive pleading. Discovery is not complete in this litigation, nor is it complete in related litigations <u>Safeco</u>, 9-CV-3312, or <u>Makhoul</u>, 11-CV-5108. The new factual allegations and claims arise out of the same set of operative facts as the pre-existing factual allegations and claims such that to the extent any additional discovery is merited by complaint amendment, it would complement existing document productions rather than trigger novel investigations. <u>Cf.</u> <u>Corbett v. City of N.Y.</u>, No. 11 Civ. 3549 (CBA) (VMS), 2013 WL 5366397, at *27 (E.D.N.Y. Sept. 24, 2013) (stating that "[p]rejudice to the opposing party is an important consideration in ruling on a Rule 15(a) motion," and holding that the defendants would be prejudiced by the proposed amendment because, <u>inter</u> <u>alia</u>, discovery had closed).

### iv. The Proposed Amendment Does Not Cause Undue Delay

In <u>Block v. First Blood Associates</u>, 988 F.2d 344, 350 (2d Cir. 1993), the Second Circuit

stated that delay without bad faith or undue prejudice is not sufficient reason to deny leave to amend. This Court, having found that Plaintiffs' proposed amendment is not in bad faith and would not cause undue prejudice, accordingly allows Plaintiffs' motion for leave to amend despite the allegations of delay. See Boda v. Phelan, Case No. 11-CV-28, 2012 WL 3241213, at *4 (E.D.N.Y. Aug. 6, 2012) ("[A]bsent a showing of prejudice or bad faith, the Second Circuit has affirmed district court rulings granting motions to amend [a pleading]" for long periods of up to four years. (citations omitted)). Plaintiffs' complaint amendment would not cause undue delay.

III.    Conclusion

In light of the foregoing, Plaintiffs' motion to amend their complaint is **granted**. Plaintiffs may file their proposed amended complaint and the Clerk of Court may issue an amended summons.

Dated:  Brooklyn, New York
        January 6, 2014

                                        _Vera M. Scanlon_
                                        VERA M. SCANLON
                                        United States Magistrate Judge